UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| NASIR UDDIN, | ) | Case No.: C 12-0908 PSG |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING DEFENDANT'S** |
| v. | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT** |
| JOHN MCHUGH, SECRETARY OF THE | ) | |
| ARMY, | ) | **(Re: Docket No. 25)** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

Defendant John McHugh, Secretary of the Army ("the Secretary") moves for summary

judgment pursuant to Fed. R. Civ. P. 56(a) on the employment discrimination claims brought by

*pro se* Plaintiff Nassir Uddin ("Uddin").[1]  Uddin opposes the motion.[2]  Having considered the

parties' papers and oral arguments, the court GRANTS the Secretary's motion.

## I.       BACKGROUND

This action arises from Uddin's termination as an Urdu language instructor at the Defense

Language Institute ("DLI").  Uddin claims that his termination was the result of his supervisors'

age and gender discrimination and as retaliation for complaining to his supervisors about the

---

[1] *See* Docket No. 25.

[2] *See* Docket No. 34.

Case No.: 12-0908 PSG
ORDER

discrimination.[3]  The Secretary maintains that Uddin's firing was the result of a legitimate, non-discriminatory evaluation of Uddin's teaching skills.[4]  The court thus begins by recounting Uddin's employment history at DLI and the events leading up to his termination.

**A.      Uddin's Employment at DLI**

Uddin began working for DLI on November 13, 2006 as part of a one-year term appointment as an Urdu language instructor.[5]  He was hired by Dr. Mahmood Taba-Tabai ("Taba-Tabai") who served as Dean of the Emerging Language Task Force ("ELTF") until 2009.[6]  His initial term was extended twice, first in December 2007 and again in December 2008.[7]  The second extension listed his end date as February 10, 2010.[8]

These extensions occurred even though Uddin failed to pass DLI's native language test for Urdu.[9]  Taba-Tabai testified that he hired Uddin anyway because he hoped that with practice Uddin, as a native Urdu speaker, would improve and would pass the test at a later date.[10]  After his first year of teaching, Uddin again took the exam but again failed.[11]  Taba-Tabai nevertheless

---

[3] *See* Docket Nos. 1, 34.

[4] *See* Docket No. 25.

[5] *See* Docket No. 26 Ex. A.  The court draws these facts from evidence the Secretary provided along with its motion.  Uddin does not appear to dispute these facts or the evidence the Secretary provided.  *See* Docket No. 34.

[6] *See* Docket No. 27 Ex. AD.

[7] *See* Docket No. 26 Ex. B, Ex. C.

[8] *See id.* Ex. C.

[9] *See* Docket No. 27 Ex. AD.

[10] *See id.*

[11] *See id.*

2

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

pressed for a waiver from DLI's provost both at the initial hiring stage and at the time of the first extension to allow Uddin to teach.[12]

In 2009, Taba-Tabai moved to a different position in DLI and Dr. Jack Franke ("Franke") replaced him as the Dean of the ELTF.[13]  In November 2008, Uddin's original first-level supervisor Yukiko Konishi ("Konishi") also changed positions and Dr. Jay Kunz ("Kunz") replaced her.[14]

According to the Secretary, throughout his time at DLI, Uddin had access to training and professional development programs.[15]  The Secretary states that the school provided training holidays to allow instructors to participate in instruction improvement programs[16] and would pay for instructors to take higher education classes.[17]  The Secretary also points to several emails that Kunz sent to the Urdu instructors regarding various professional development opportunities, including new South Asian journals and conferences.[18]

Uddin apparently attended at least fourteen seminars during one of the breaks in the school calendar[19] but did not take advantage of the higher education program.[20]  In his deposition, Uddin asserted that unlike the other Urdu instructors, he already had a degree and a certification and so

---

[12] *See id.*

[13] *See* Docket No. 27 Ex. AD.

[14] *See id.*

[15] *See* Docket No. 25.

[16] *See* Docket No. 26 Ex. I.

[17] *See id.* Ex. J.

[18] *See id.* Ex. I.

[19] *See id.* Ex. G.

[20] *See id.* Ex. J.

Case No.: 12-0908 PSG
ORDER

3

did not need to attend higher education classes.[21]  He also stated that "[b]ecause [he] was . . .

teaching those people, those who were taking the course," he did not "go to that type of courses

[sic]."[22]  In his papers, however, Uddin asserts that he did not have opportunities to attend seminars

and that the one time he approached Kunz regarding a conference, Kunz failed to respond to his

request.[23]  He also asserts that unlike younger female instructors, he was not provided with

sufficient opportunities to improve his teaching skills.[24]

**B.     Teaching Performance**

DLI uses several metrics to assess the performance of its instructors, including observation

by supervisors, students' rate of passage on language exams, and student surveys called Interim

Semester Questionnaires ("ISQs") and End of Semester Questionnaires ("ESQs").[25]  Supervisors

assess instructors' performance through a variety of factors known as the Total Army Performance

Evaluation System ("TAPES") that is summarized into a single score.[26]  The TAPES score is based

on a five-point system with "1," "2," and "3" indicating that the instructor is successful, "4"

indicating that the instructor is fair, and "5" indicating that the instructor is failing.[27]  The ISQs and

ESQs involve surveys filled out by students in which they assess instructors' performance by

grading several factors on a four-point scale.[28]  "4" is the highest score a student can give, and

---

[21] *See* Docket No. 27 Ex. AG at 133:13-134:5.

[22] *See id.* at 133:8-11.

[23] *See* Docket No. 34.

[24] *See id.*

[25] *See* Docket No. 26 Ex. D; Docket No. 27 Ex. AD at 99:10-13.

[26] *See* Docket No. 26 Ex. E.

[27] *See id.*; Ex. AD at 200:2-25.

[28] *See* Docket No. 26 Ex. D; Docket No. 27 Ex. AD at 99:10-13.

4

Case No.: 12-0908 PSG
ORDER

according to DLI's employees an average score below a "3" requires action to improve an instructor's performance.[29]

In July 2008, Uddin's ESQ average score from the five students he taught that semester was 2.12.[30]  The student comments included complaints about Uddin's failure to use sufficient Urdu in class, his tendency to speak on topics unrelated to the class in English, his failure to accurately translate between the two languages, and his comments about the students' ethnicities and about ethnic groups in general.[31]  Neither Uddin's nor any other Urdu professors' students who graduated in July 2008 passed the Defense Language Proficiency Test ("DLPT") for Urdu.[32]

In October 2008, Uddin's supervisor Konishi completed her TAPES review after observing his class and assessed Uddin's performance as a "4," meaning "fair."[33]  Her assessment also factored in the ESQ scores and comments and the failure of the Urdu students to pass the DLPT.[34] She identified three objectives that needed improving: (1) adequate preparation for class, (2) speaking in the target language, and (3) creation of appropriate and engaging classroom activities.[35]

In light of the failure by all of DLI's Urdu students to pass the DLPT and facing a congressional inquiry into the students' performance, in 2008 Taba-Tabai (still the Dean of the ELFT at the time) put five teachers including Uddin on a performance improvement plan ("PIP").[36]

---

[29] *See* Docket No. 26 Ex. D.; Docket No. 27 Ex. AD at 198:13-25.

[30] *See* Docket No. 26 Ex. D.

[31] *See id.*

[32] *See* Docket No. 27 Ex. AD at 27:4-23.

[33] *See* Docket No. 26 Ex. E; Docket No. 27 Ex. AD at 200:13-25.

[34] *See* Docket No. 27 Ex. AD at 201:13-20.

[35] *See* Docket No. 26 Ex. E.

[36] *See* Docket No. 27 Ex. AD at 28:2-23.

Case No.: 12-0908 PSG
ORDER

Three of the five instructors improved on the PIP; Uddin and one other instructor eventually were terminated.[37]

## C.     Performance Improvement Plan

Kunz, who by this time had replaced Konishi as Uddin's first level supervisor, provided Uddin with notice on December 15, 2008 that Uddin was subject to the PIP beginning January 5, 2009.[38]   As part of the plan, Kunz, Franke, and Dr. Munajat ("Munajat"), an academic specialist who aids with classroom improvement, observed Uddin's classes.[39]   They noted various concerns with Uddin's performance, including allowing students to speak in English too often,[40] failing to use technology or visuals to aid instruction,[41] ineffective use of pair work or group activities that should aid in learning,[42] and, according to Munajat, that the instruction was "[n]ot leading to a higher level use of language."[43]   Kunz noted, however, that Uddin's classroom was "pleasant,"[44] and Munajat observed that students were "at ease" and that Uddin "consistently monitor[ed]" the students and "provide[d] feedback when asked."[45]

According to Kunz, while Uddin was on the PIP, students approached Kunz regarding Uddin's teaching.[46]   He documented complaints that students could not understand Uddin, that

---

[37] *See id.* Ex. AG at 119:12-15.

[38] *See* Docket No. 26 Ex. F.

[39] *See id.*; Exs. K, L, N, O, P.

[40] *See id.* Exs. L, N, O.

[41] *See id.* Exs. K, L.

[42] *See id.* Exs. K, L, N.

[43] *See id.* Ex. L.

[44] *See id.* Ex. N.

[45] *See id.* Ex. L.

[46] *See id.* Ex. Q.

6

Case No.: 12-0908 PSG
ORDER

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Uddin failed to adequately explain Urdu grammar, and that he often cut them off in the middle of their questions or comments in Urdu.[47]  In surveys, students apparently reported that Uddin is a "[n]ice guy" and "has the potential to be an outstanding teacher in the future," but he "still needs to build an understanding of the needs of the student and develop better techniques in assisting the student" and that he "has problems communicating and explaining concepts."[48]  In ESQ responses, the students noted that he "taught most of the year in English," that he "would come in with no curricular plan, or not even knowing what topic was being discussed," and that "[d]uring his class we were almost always off topic."[49]

According to the Secretary, because of Uddin's lack of improvement, in May 2009 Kunz requested that Uddin's appointment not be extended.[50]  Uddin's PIP nevertheless was extended from June 4, 2009 to June 26, 2009.[51]  Following the extension, Kunz again requested that Uddin be terminated from his position.[52]  Kunz identified three areas in which Uddin failed to make sufficient progress in his PIP.[53]  In the first, "Teaching and Material Development," Kunz noted student remarks and his own observations about Uddin's failure to use a teaching style that effectively instructed students.[54]  For the second deficiency, "Use of Target Language," Kunz pointed to student complaints about being unable to understand Uddin's English and his inability to

---

[47] *See id.*

[48] *See id.* Ex. R.

[49] *See id.* Ex. D.

[50] *See id.* Ex. R.

[51] *See* Docket No. 27 AD at 90:1-4, 238:4-9.

[52] *See* Docket No. 26 Ex. U.

[53] *See id.*

[54] *See id.* Ex. V.

Case No.: 12-0908 PSG
ORDER

smoothly translate between Urdu and English.[55]  For the third deficiency, "Teaching: Learner-Centered Activities," Kunz highlighted students' comments that Uddin cut them off before they could finish their sentences or even ignored their questions.[56]

In his response to Franke, Uddin asserted that the students' comments were motivated by their frustration with Uddin for being "one of the few teachers to not accept certain student's [sic] lazy work ethics and lack of motivation."[57]  He also contended that the students' survey comments were "unilateral" and "sometimes exaggerated" and that the students that year "had a discipline problem."[58]  He also offered explanations and rebuttals for each of the comments in Kunz's letter, including references to the difficulty in directly translating between Urdu and English and an admission that he was working to correct his tendency to interrupt students.[59]

Citing to Uddin's failure to progress according to the goals set in the PIP and the various documents he found supported that conclusion, on August 20, 2009, Franke notified Uddin that his removal from the position would be effective September 4, 2009.[60]

**D.     Team Building Event and June 9, 2009 Letter**

In the midst of the issues surrounding his performance, Uddin participated in two events for which he asserts the Secretary and DLI retaliated against him.  The first event was a team-building exercise on December 17, 2008 in which Uddin and six other members of the Urdu department participated.[61]  During the exercise, Uddin claims that he complained about Kunz's preference for

---

[55] *See id.*

[56] *See id.*

[57] *See id.* Ex. T.

[58] *See id.*

[59] *See id.*

[60] *See id.* Ex. M.

Case No.: 12-0908 PSG
ORDER

younger female teachers.[62]  Uddin concedes that neither Kunz nor Franke were at the team building exercise and that he does not know if anyone told them about his remarks, but he believes that they learned of his comments.[63]

The second event involved a letter to Franke that was signed by eight Urdu instructors that complained that Kunz preferred younger female instructors and listed ways in which Kunz exhibited that preference.[64]  In the letter, the instructors assert among other things that Kunz only sent certain younger female instructors to important and out-of-state conferences, he offered only the younger women better assignments within the department, and he set unrealistic expectations for classroom performance for the older and male staff while letting the younger female instructors make errors without comment.[65]

## E.        Administrative Proceedings

Following his termination, Uddin appealed Franke's decision to the Merit Systems Protection Board ("MSPB").  The Administrative Judge ("AJ") found that the various performance reports that Franke, Kunz, Munajat, and Konishi gave Uddin failed to provide him with fair notice of how his performance was failing and how he could improve.[66]  The AJ determined that DLI failed to meet its burden of showing that Uddin's early termination for unacceptable performance

---

[61] *See* Docket No. 27 Ex. AD at 299:9-11.

[62] *See id.* Ex. AE at 34.

[63] *See id.* Ex. AG at 144:17-25, 147:8-149:23.

[64] *See* Docket No. 26 Ex. T.

[65] *See id.*

[66] *See* Docket No. 27 Ex. AE.

Case No.: 12-0908 PSG
ORDER

United States District Court
For the Northern District of California

was warranted.[67]  As a result, the AJ ordered that Uddin be deemed reinstated for the remainder of his contract with DLI and compensated for the remaining time.[68]

The AJ found, however, that Uddin failed to show that Kunz or Franke discriminated against him because of his age or gender.[69]  He also found that Uddin failed to show that he was dismissed in retaliation for his complaints about preferential treatment at the team-building exercise or in the June 9, 2009 letter.[70]  After Uddin appealed the MSPB decision regarding sexual discrimination and retaliation, the Equal Employment Opportunity Commission concurred with the MSPB that Uddin failed to make a sufficient showing of any bias or retaliation.[71]

Uddin then filed suit in this court alleging that he was subjected to sexual discrimination and retaliation in violation of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e-2, and age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 49 U.S.C. § 621.

## II.    LEGAL STANDARDS

Summary judgment is proper if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[72]  The moving party bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a triable issue of material fact.[73]  If the moving party meets its initial burden, then the non-

---

[67] *See id.* at 25.

[68] *See id.* at 38.

[69] *See id.* at 32.

[70] *See id.* at 36.

[71] *See id.* Ex. AC.

[72] Fed. R. Civ. P. 56(a).

[73] *See* Fed. R. Civ. P. 56(c)(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

10

Case No.: 12-0908 PSG
ORDER

moving party must set forth specific facts showing that there is a genuine issue for trial.[74] A genuine issue for trial exists if there is sufficient evidence for a reasonable jury, viewing the evidence in the light most favorable to the non-moving party, to return a verdict for the nonmoving party.[75]  If the nonmoving party fails to make the requisite showing, "the moving party is entitled to judgment as a matter of law."[76]

### III.     DISCUSSION

### A.     Gender Discrimination

Uddin claims that he was subject to sexual discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2.  For a claim of sexual discrimination, the court applies the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*.[77]  "Under this analysis, plaintiffs must first establish a prima facie case of employment discrimination."[78]  "If plaintiffs establish a prima facie case, 'the burden of production, but not persuasion, shifts to the employer to articulate some legitimate, non-discriminatory reason for the challenged action.'"[79] "If defendant meets this burden, plaintiffs must then raise a triable issue of material fact as to whether defendant's proffered reasons for their termination are mere pretext for unlawful discrimination."[80]

---

[74] Fed. R. Civ. P. 56(e).

[75] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[76] *Celotex*, 477 U.S. at 323.

[77] 411 U.S. 792 (1973).

[78] *See Hawn v. Exec. Jet Mgmt, Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010).

[79] *Id.*

[80] *Id.*

11

Case No.: 12-0908 PSG
ORDER

"To establish a prima facie case, plaintiffs 'must offer evidence giving rise to an inference of unlawful discrimination.'"[81]   To do so, plaintiffs may rely on circumstantial evidence showing: (1) "that they are members of a protected class"; (2) "that they were qualified for their positions and performing their jobs satisfactorily"; (3) "that they experienced adverse employment actions"; and (4) "that similarly situated individuals outside their protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination."[82]   Although similarly-situated persons outside of the protected class need not be identical to a plaintiff, they must "be similar in all material respects," which "will depend on context and the facts of the case."[83]

The Secretary argues that Uddin has not established a prima facie case because he has not identified a similarly-situated woman who was treated more favorably.[84]   Uddin responds that three women, Sameera Sharif ("Sharif"), Ms. Batool ("Batool") and Ms. Rhabia ("Rhabia"),[85] were similarly situated because they shared the same supervisor as Uddin, they were required to follow the "same standard of teaching" and because Uddin and the women were teachers.[86]   According to Uddin, Sharif obtained a better position on the curriculum development team despite her lesser ability to speak and read Urdu, all three of the women received better opportunities to attend conferences and seminars, and Batool avoided being placed on a PIP despite her students' failure to pass the Urdu language exam.[87]   The Secretary argues that even if the three women were treated

---

[81] *Id.* at 1156.

[82] *See id.*

[83] *See id.* at 1157.

[84] *See* Docket No. 25.

[85] The parties have not provided the first names for Ms. Batool or Ms. Rhabia.

[86] *See* Docket No. 34.

12

Case No.: 12-0908 PSG
ORDER

differently, they were not similarly situated because they did not have the same problematic performance reviews that Uddin received from students and supervisors.[88]

The Ninth Circuit has advised that consideration of an employer's arguments regarding whether an employee is similarly situated is more appropriate in the third step of the *McDonnell Douglas* framework because those arguments really address whether an employer's decision was pretextual.[89] The difference between the first and third stages of the framework matters because the burden at the third stage is greater than at the first stage.[90] And so, at the prima facie stage, the court considers whether Uddin has shown a woman with whom he has a "similar job[]" and who "display[s] similar conduct."[91] The Ninth Circuit has observed that even at the prima facie stage, "employees who have not engaged in problematic conduct of comparable seriousness . . . are not similarly situated."[92]

The court notes that there is no evidence before it that the three women Uddin points to had similar student complaints or low ESQs or ISQs. Here, Kunz and Franke ultimately terminated Uddin on the grounds that his teaching performance had not improved sufficiently on the PIP.[93] The fact that none of the women had similarly poor performance indicators is a material difference between Uddin and the women such that any disparity in their respective treatment does not give rise to an inference of discrimination. Although Uddin points to the poor reviews by Kunz as adverse actions that he believes Kunz subjected him to on account of his sex, Uddin cannot say the

---

[87] *See id.*

[88] *See* Docket No. 35.

[89] *See Hawn*, 615 F.3d at 1158.

[90] *See id.*

[91] *See Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003).

[92] *Freeman v. Astrue*, 405 Fed. Appx. 148, 151 (9th Cir. 2010).

[93] *See* Docket No. 26 Exs. M, U.

Case No.: 12-0908 PSG
ORDER

United States District Court
For the Northern District of California

same for the student reviews.  The lack of similar negative student reviews about the women suggests that they were not similarly situated to Uddin.

Uddin disputes the relevance of the ISQ and ESQ metrics but he does not dispute their existence or their accuracy.[94]  The substance of his argument is that the ESQs and the ISQs reflect student biases and therefore should not be given weight in assessing teacher performance.[95]  Uddin suggests that the poor student reviews stem from attempts by Batool to disrupt his classroom atmosphere by ending her class late so his class started behind schedule and prevented students from enjoying a break before his instruction.[96]  But the complaints from the students stem from an inability to understand Uddin and from his problematic Urdu usage during class.[97]  The complaints do not stem from his failure to provide them with breaks or with late starts to his class.  Neither his dispute with the relevance of the student feedback nor the substance of the reviews supports an inference that he was the subject of discrimination by his supervisors.

Uddin also alleges that he was not provided with the same opportunities to attend conferences and workshops as the three women.[98]  Although Uddin makes allegations regarding the number of conferences he and the three women attended, he does not provide evidence to support his assertions.  The Secretary has provided evidence suggesting that Uddin in fact attended at least fourteen seminars during one school break and that Kunz circulated emails to Urdu instructors with conference opportunities.[99]  Uddin does not appear to dispute the accuracy of these exhibits.

---

[94] *See* Docket No. 34.

[95] *See id.*

[96] *See id.*

[97] *See* Docket No. 26 Ex. D.

[98] *See* Docket No. 34.

14

Case No.: 12-0908 PSG
ORDER

United States District Court

For the Northern District of California

Because Uddin has not established that a similarly situated woman with the same type of performance reviews from students was treated more favorably than he was, Uddin has not established a prima facie case of sexual discrimination.

Even if Uddin had established a prima facie case, however, the Secretary has offered a legitimate, non-discriminatory reason for Uddin's termination, specifically his poor performance as an Urdu instructor as evidenced by his low ISQ and ESQ scores and TAPES scores and his failure to improve while on the PIP.  Because of that showing, the burden shifts back to Uddin to show a triable issue that the Secretary's reasons are pretextual.  Uddin has not made that showing.

Uddin argues that because Batool, Rhabia, and Sharif received better assignments, they must have benefited from preferential treatment on account of their sex, and so Kunz's and Franke's reasons for his termination and his treatment are pretextual.  But Uddin puts the cart before the horse.  Before he can assert that the women received better assignments because of their sex, he must establish that he was in the same or a similar position as the women to preclude any other reason why they received that treatment and thus to give rise to an inference of pretext.  Here, Uddin has alleged dissimilar treatment but he has not shown that the disparity resulted from the fact that he was a man.  Uddin's ISQs and ESQs reflected performance problems and no evidence before the court suggests that the women had similar performance issues.  Uddin therefore has not provided a sufficiently similarly situated woman against whom his treatment would suggest a pretextual motive.  He has not provided therefore sufficient evidence to raise a triable issue of fact regarding whether Kunz's or Franke's actions were pretextual.[99]

The Secretary's motion for summary judgment on Uddin's gender discrimination claim is GRANTED.

---

[99] *See* Docket No. 26 Exs. G, I, J.

Case No.: 12-0908 PSG
ORDER

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.      Age Discrimination**

Uddin also claims that he was subjected to adverse actions on account of his age in violation of the ADEA.  Unlike a Title VII claim in which plaintiffs need only show that their protected status was a motivating factor in the adverse action to establish discrimination, plaintiffs alleging discrimination under the ADEA "must prove at trial that age was the 'but-for' cause of the employer's adverse action."[100]  Despite this difference in burden at trial, however, at the summary judgment stage claims under the ADEA are subject to the same *McDonnell Douglas* burden-shifting framework.[101]  Thus Uddin must first establish a prima facie showing of discrimination, and if he is successful, the Secretary must meet his burden of production to "articulate some legitimate, nondiscriminatory reason for the challenged actions."[102]  If the Secretary makes that showing, the burden shifts back to Uddin to raise a triable issue of material fact as to whether the "proffered reasons for [his] termination[] are mere pretext for unlawful discrimination."[103]

To make a prima facie case for age discrimination, Uddin must show "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion."[104]  To meet this burden through circumstantial evidence, Uddin must show that he was: (1) "a member of a protected class [age 40-70]"; (2) "performing his job in a satisfactory manner"; (3) "discharged"; and (4) "replaced by a substantially younger employee with equal or inferior qualifications."[105]  The fourth element must be treated with more flexibility; plaintiffs may show

---

[100] *Shelley v. Geren*, 666 F.3d 599, 607 (9th Cir. 2012) (citing *Gross v. FBL Financial Servs., Inc.*, 557 U.S. 167, 176 (2009)).

[101] *See id.* at 607-08.

[102] *See id.* at 608.

[103] *See id.*

[104] *See id.*

[105] *See Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 917 (9th Cir. 1996).

16

Case No.: 12-0908 PSG
ORDER

through "circumstantial, statistical, or direct evidence that the discharge occurred under circumstances giving rise to an inference of age discrimination."[106]

      Uddin was sixty-six years old when he was discharged from DLI, and so he meets the first and third elements of the prima facie case.[107]   He also claims that he was performing his job satisfactorily.[108]   The Secretary argues that Uddin cannot establish a prima facie case of age discrimination because he was replaced by two men, one of whom was a man who was older than or in the same age range as him.[109]   In his deposition, Uddin admitted that one of the men who replaced him was "very old,"[110] and who he thought was "60, 62, 63"[111] or in his "fifties or sixties."[112]   As to the other man who replaced him, Uddin asserted that he believed the man was in his thirties.[113]

      Uddin responds that despite the hiring of two men, one of whom was near Uddin's age, both men were ultimately replaced by younger women, although he does not provide evidence of this hiring practice.[114]   The Supreme Court has advised, however, that in the age-discrimination context, "the replacement of one worker with another worker insignificantly younger" does not give rise to an inference of discrimination.[115]   Here, Uddin admits that a man whose difference in

---

[106] *See id.*

[107] *See* Docket No. 27 Ex. AG at 16:11-13.

[108] *See* Docket No. 33.

[109] *See* Docket No. 25.

[110] *See* Docket No. 36 at 190:16-19.

[111] *See id.* at 191:2.

[112] *See id.* at 191:3-6.

[113] *See id.* at 190:17.

[114] *See* Docket No. 33; *see also* Docket No. 36 at 190:14-15.

[115] *See O'Conner v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313 (1996).

17

Case No.: 12-0908 PSG
ORDER

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

age was only a few years replaced him after his termination; the closeness in their ages dispels an inference of age discrimination.

Uddin also argues that there was a pattern under Kunz's supervision of treating young female instructors better than the older instructors.[116]   He alleges that the younger instructors received better assignments and more opportunities to attend conferences and seminars.[117]   The Secretary counters that Uddin has not identified a younger employee with equal or inferior qualifications in light of the disparity between Uddin's ISQ and ESQ scores and the ISQ and ESQ scores of the younger women he asserts were treated more favorably.[118]

Because Uddin essentially offers the same instructors for his age discrimination claim as for his gender discrimination claim and the court already has explained that Uddin failed to establish a similarly-situated person in that context, the court only notes again here that because of the differences in the student reviews, Uddin was not similarly situated to Rhabia, Batool, or Sharif. Because Uddin has not shown a similarly situated younger person who was treated more favorably, he has not made a prima facie showing of discrimination.

Even assuming that Uddin had established a prima facie showing of age discrimination, the Secretary has met his burden of producing evidence articulating a legitimate, nondiscriminatory reason for the difference in treatment of Uddin.  The Secretary points to Uddin's low ESQ and ISQ scores and TAPES reviews by both Konishi and Kunz showing that Uddin's teaching performance was problematic.  This evidence satisfies the Secretary's burden of production that any adverse action against Uddin was not the result of discrimination.  The burden thus shifts back to Uddin to show that the nondiscriminatory reasons were pretext for discriminatory motives.

---

[116] *See* Docket No. 33.

[117] *See id.*

[118] *See* Docket No. 25.

18

Case No.: 12-0908 PSG
ORDER

Uddin asserts that the younger women received preferential treatment and that it was because they were younger.  But Uddin has not provided evidence beyond his suspicions and subjective belief that the reason for any preferential treatment was a difference in age.  Absent evidence that could support a reasonable inference of discrimination, there is no genuine dispute of a material fact.  The Secretary's motion for summary judgment on Uddin's age discrimination claim is GRANTED.

## C.      Retaliation

Uddin's last claim concerns his comments at the team-building exercise in December 2008 and his signature on a letter complaining of disparate treatment of older instructors.  According to Uddin, his supervisors treated him less favorably and ultimately terminated him as retaliation for his complaints of unlawful discriminatory treatment.

Title VII prohibits retaliation by an employer against employees who complain of treatment that is unlawful under its provisions, namely discrimination on the basis of "race, color, religion, sex, or national origin."[119]  The ADEA likewise protects employees from retaliatory adverse actions imposed by employers because of employees' complaints about unlawful age discrimination.[120]  Under either statute, the elements of a retaliation claim are the same.[121]

To establish a prima facie case of retaliation, plaintiffs must show that: (1) they engaged in protected activity; (2) suffered an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action.[122]  If plaintiffs make that showing, the *McDonnell*

---

[119] *See* 42 U.S.C. § 2000e-3(a).

[120] *See* 29 U.S.C. § 623(d).

[121] *See Davis v. Team Elec. Co.*, 520 F.3d 1080, 1093-94 (9th Cir. 2008) (listing elements for retaliation under Title VII); *Poland v. Chertoff*, 494 F.3d 1174, 1179-80 (9th Cir. 2007) (reciting three elements for retaliation under ADEA).

[122] *See Davis*, 520 F.3d at 1093-94; *Poland*, 494 F.3d at 1179-80.

19

Case No.: 12-0908 PSG
ORDER

United States District Court
For the Northern District of California

*Douglas Corp.* shifting scheme again applies.[123]   The burden shifts to the employer to produce evidence supporting a legitimate, nondiscriminatory reason for the adverse action, and if the employer makes that showing, the burden moves back to plaintiffs to show that the employer's reason is pretextual.[124]

For the first element, Uddin points to his complaints at the team-building exercise regarding Kunz's management style and to a letter he signed that consisted of complaints about preferential treatment of younger women in the department that was signed by eight of the thirteen instructors in the department including Uddin.[125]   To establish the protected activity element, Uddin must show that he "had a reasonable belief that the employment practice [he] protested was prohibited,"[126] which requires satisfying both a subjective and an objective prong.[127]

As the Secretary points out, it is not entirely clear that Uddin's complaints at the team-building exercise fall within Title VII's or the ADEA's umbrella of protected activity because Uddin has not indicated that he in fact complained about discrimination rather than Kunz's management style.[128]   Although in his papers, he asserts that his complaint concerned Kunz's preference for younger women, in his testimony before the AJ in MSPB proceeding, he suggested that his complaint was about Kunz's "methodology, how to deal with teamwork or to build a team," and that Kunz used a "divide and rule theory."[129]   Uddin's signature on the letter, in

---

[123] *See Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464-65 (9th Cir. 1994).

[124] *See id.*

[125] *See* Docket No. 33; *see also* Docket No. 26 Ex. T.

[126] *See Trent v. Valley Elec. Ass'n Inc.*, 41 F.3d 524, 526 (9th Cir. 1994); *see also Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.2d 838, 845 n.1 (9th Cir. 2002) (noting that this standard remains Ninth Circuit law).

[127] *See Moore*, 275 F.2d at 845 n.1.

[128] *See* Docket No. 27 Ex. AD 300:9-22.

[129] *See id.*

20

Case No.: 12-0908 PSG
ORDER

United States District Court
For the Northern District of California

contrast, falls within the statutes' definitions of protected activity because he and his coworkers complained about preferential treatment of younger, female employees, which meets both the subjective and objective prongs.[130]  On this first element, through the letter at least if not the complaints at the team-building exercise, Uddin has satisfied his obligation.

For the second element, Uddin points to his termination and to treatment that was less favorable during his tenure as adverse actions taken by Kunz and Franke.  To show the second element, plaintiffs must "show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[131]  Unfavorable treatment, such as poor performance reviews and lack of access to conferences, and Uddin's ultimate termination are material adverse actions that fall within the scope of the statute.[132]  Uddin has satisfied this second element as well.

For the third element, causation, Uddin must show that Kunz and Franke subjected him to the adverse actions because of his protected activity.  "To establish causation [plaintiffs] must show by a preponderance of the evidence that engaging in the protected activity was one of the reasons for [their] firing and that but for such activity [they] would not have been fired."[133]  "[I]n some cases, causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity," but "timing alone will not show causation in all cases."[134]

---

[130] *See* Docket No. 26 Ex. T.

[131] *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

[132] *See Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (noting that "[t]ransfer of job duties and undeserved performance ratings, if proven would constitute 'adverse employment decisions' cognizable under" Title VII).

[133] *Villiarimo v. Aloha Island Air Inc.*, 281 F.3d 1054, 1064-65 (9th Cir. 2002).

21

Case No.: 12-0908 PSG
ORDER

United States District Court

For the Northern District of California

On this element, Uddin cannot meet his burden.  He presents no evidence beyond his suspicions that Kunz or Franke learned of his comments at the team-building exercise, assuming that the comments even were protected activity.  Uddin admitted that neither Kunz nor Franke were at the team building exercise,[135] and both men indicated that they had not heard of Uddin's comments until after the decision to terminate him.[136]   Uddin testified that he was sure Kunz and Franke heard about the comments,[137] but he does not provide any evidence that Kunz learned of his statements or that anyone told Kunz.  Uddin points only to a sense that Kunz was different after the exercise to suggest that he learned of the comments.[138]  As to Franke, Uddin provides only his belief that "[e]verything we discuss [sic] in [the December 17] meeting, everything went to Kunz, and later on when Franke came on board, it went to him."[139]  Absent a showing that Kunz or Franke knew of his comments at the December 17 training, Uddin cannot satisfy his burden that his activity at that meeting was the cause of the actions taken against him.

Uddin likewise cannot show causation between the letter he signed and any adverse action.  The letter was dated June 9, 2009,[140] which was over a month after Kunz recommended that Uddin's contract not be renewed.[141]  Because the protected activity post-dates Kunz's decision, it cannot have "caused" his determination that Uddin should be terminated.

---

[134] *Id.* at 1065.

[135] *See* Docket No. 27 Ex. AG at 144:17-19, 148:23 – 149:3.

[136] *See id.* Ex. AD at 138:5-25, 260:17-24.

[137] *See id.* Ex. AG at 147:21 – 148:4, 149:17 – 23.

[138] *See id.* at 148:1 – 4.

[139] *Id.* at 150:3 – 5.

[140] *See* Docket No. 26 Ex. T.

[141] *See id.* Ex. R.

Case No.: 12-0908 PSG
ORDER

Because Uddin signed the letter before Franke decided to terminate him, Franke could have made his decision in retaliation for Uddin's protected activity.[142]  But as described above, the Secretary has offered evidence supporting a legitimate non-discriminatory reason for Uddin's termination, specifically his poor student reviews and his problematic teaching performance, and so the burden moves back to Uddin to proffer evidence suggesting the decision was pretextual.

Uddin has not made that showing.  Although the close time between the letter and Franke's decision could support an inference of retaliation,[143] the evidence here conclusively dispels that conclusion.  Uddin had poor performance reviews well before he signed the letter, he had been placed on the PIP several months before, and the evaluations after he was on the PIP but before he signed the letter reflected a failure to improve.  In his dismissal letter, Franke cites to Uddin's failure to improve on the PIP and relies in part on Kunz's July letter recommending that the contract be terminated.[144]  Kunz's July letter mirrors his May recommendation,[145] and as noted above, the May recommendation could not have been an attempt by Kunz to retaliate against Uddin for his protected activity.  Other than his belief that he was terminated for retaliation, Uddin does not offer evidence supporting his claim.  The Secretary's motion for summary judgment on Uddin's retaliation claims therefore is GRANTED.

**IT IS SO ORDERED.**

Dated:   April 8, 2013

PAUL S. GREWAL
United States Magistrate Judge

---

[142] *See Villiarimo*, 281 F.3d at 1065.

[143] *See id.*

[144] *See* Docket No. 26 Ex. M.

[145] *See id.* Exs. R, U.

Case No.: 12-0908 PSG
ORDER

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Case No.: 12-0908 PSG
ORDER